Howell, Judge,
delivered the opinion of the court:
In Levy v. United States, 118 C. Cls. 106, we considered the defendant’s demurrer to plaintiff[1]’s petition in the instant case. In substance, we decided that since plaintiff had alleged that his dismissal from federal service was capricious, malicious, arbitrary, in bad faith, and without a hearing, the defendant by its demurrer had admitted enough to entitle plaintiff to a hearing upon the merits of his case.
Plaintiff diligently presented witnesses as well as documentary evidence during the hearings upon the merits, which evidence forms the basis for our rather exhaustive findings of fact. From the whole record we have found that the evidence does not establish that plaintiff was not afforded a full and fair on-the-job trial in the position to which he was appointed or that any of the actions of any of the officials of the War Production Board in removing plaintiff from the *147 employment roll for the good of the service was arbitrary or capricious, or taken in bad faith, or as the result of malice or ill will (Finding45).
Plaintiff has failed to meet the burden of proof cast upon him by the material allegations of his petition. Therefore, there is no liability on the part of defendant and plaintiff’s petition must be dismissed. Elchibegoff v. United States, 123 C. Cls. 709.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
TENDINGS OE TACT
The court makes findings of fact, based upon the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, as follows:
1. Plaintiff is a naturalized citizen of the United States[1] and a resident of the District of Columbia.
2. In' 1917, plaintiff passed a competitive civil service examination for a position as economist. On January 21,1918, he received a probationary appointment as economist in the War Trade Board, and served in that position until May 15, 1919.[2] Thereafter, he was employed by excepted appointment as an examiner by the Federal Trade Commission from January 23, 1920, to July 31, 1920. The Interstate Commerce Commission gave him temporary appointments (1) as examiner, from August 2,1920, to November 1,1920, and (2) as economist, from November 11,1920, to April 30,1921. Plaintiff resigned from the Federal service on April 30,1921. The records of the Civil Service Commission do not indicate delinquency or misconduct by plaintiff in connection with the termination of any of the foregoing employments.
*148 3. On August 28,1943, plaintiff submitted (on Civil Service Commission Standard Form No. 57) an application for employment by the War Production Board. He was thereafter interviewed by Mr, David Ziskind, who subsequently became (and is sometimes hereinafter referred to as) the Employing Officer, with respect to plaintiff’s employment by the War Production Board.
4. On October 22, 1943, a War Production Board form for “Recommendation for Filling Position” was initiated by the Employing Officer looking toward the employment of plaintiff. As initially drawn this form recommended plaintiff’s “appointment” to the position of “economist— P-4 — $3800—WPB—Manpower Requirements Office — Division of Labor Requirements — Equipment and End Products Branch — Construction and Utilities Section.” As finally filed, the form recommended plaintiff’s “reinstatement” from the position of “economist,” “Finance Bureau,” to the position of “labor economist,” “WPB,” et cetera, as above.
5. Sometime in October 1943, the War Production Board submitted to the Civil Service Commission (on the Commission’s Standard Form No. 46) a request for authority for the “reinstatement” of plaintiff from his “former classified status” and position of economist in the Finance Bureau of the Interstate Commerce Commission, to “status” with the War Production Board in the position of labor economist.
6. On November 9, 1943, the Civil Service Commission issued its Certificate C-41070 under War Service Regulation VIXI authorizing plaintiff’s appointment.[3]
7. On November 15,1943, the War Production Board gave to plaintiff a standard form of “Advice of Personnel Action” whereby it notified plaintiff that “the War Production Board has taken the following action with regard to your employment. Nature of Action: War Service Appointment — Reinstatement—Indef. Effective Date: November 15, 1943. To: Position, Labor Economist (Construction Utilities) ; Grade and Salary, P-4, $3,800 * * The form was signed by the Employing Officer and the Director of Personnel, and contained the following advice:
*149 Under this appointment you are subject to the provisions of the Civil Service Retirement Act as amended, and accordingly 5% will be deducted from your basic salary for deposit to your credit in the Retirement Fund.
This appointment is for such time as your services may be required and funds are available therefor.
The form contained two additional paragraphs of advice, each of which was preceded by a box. The box preceding the first paragraph was blank. The box preceding the second paragraph contained a typewritten “X”. The two paragraphs follow:
□ The first year of service under this appointment shall be a trial period, satisfactory completion of which shall be considered part of the entrance examination. If conduct or capacity at any time during this period is not satisfactory, the appointment may be terminated.
[x] This appointment is subject to the condition that a character investigation, yet to be made, will be satisfactory. If unsatisfactory, the appointment will be terminated.[4]
8. Plaintiff took the oath of office and began work on November 15, 1943.
9. At some unspecified time after plaintiff began work there was placed in his personnel file a copy of a job description.[5] This document had been prepared before plaintiff was appointed to the position of labor economist. It purported to cover more than one position of labor economist, grade P-4. The job description stated that the incumbent would “supervise lower grade research and statistical economists as assigned,” [6] and described the duties to be performed as follows:
1. Represent the Manpower Requirements Office in assigned industry divisions. Act as liaison and as a clearing house for all needed action and information relative to manpower demands between the Industry Divisions and all manpower operating and statistical agencies. Serve as a channel whereby information required *150 by the War Manpower Commission relating to the industrial areas of the Divisions is made available.
2. Aid the Industry Divisions for which he is responsible in obtaining all employment and manpower statistics and information it requires. Provide and interpret to the Industry Divisions all pertinent data of the War Manpower Commission, the Department of Labor, the U. S. Census, the Social Security Board and other fact-finding agencies.
3. From an analysis of production and employment schedules, charts, graphs and other data gathered and compiled by lower grade economists, determine the manpower requirements of the industries assigned to him, by products, plant and area.
4. Assemble data with respect to the need for labor recruitments, draft deferment, labor training and other forms of manpower relief and present such data to the WMC and other operating agencies with recommendations for specific action to meet these needs.
5. Consult with and advise the Industry Division in the conduct of fact-finding investigations relating to the manpower requirements of its several industries.
6. Develop comparative data, in cooperation with the Office of Labor Production, regarding the relative labor productivity of war plants, and make recommendations with respect to the scheduling of production and labor demand.
7. Secure the necessary services and relations, primarily with the War Manpower Commission and the Department of Labor, in the collection and analysis of manpower requirements data.
8. Direct the activities of lower grade economists who gather, collect, and compile data on manpower requirements in specified industries.
9. Perform related work of a similar degree of difficulty as required.
At the end of the job description was the following:
The incumbent will be assigned to one or more of the following industry divisions: Building Materials, Plumbing & Heating, Transportation and Equipment.
It is not established by the evidence that plaintiff was ever assigned to any of the divisions named in the preceding paragraph.
There was no specific mention of the preparation of digests in the job description.
*151 10. During October and November 194.3, tbe Office of Manpower Requirements of the War Production Board was recruiting staff for a new division, of which the Employing Officer was Chief.[7] There were openings for several labor economists who were to be assigned to service various industry divisions of the War Production Board outside of the Office of Manpower Requirements. As labor economists were employed, they were to be assigned to industry divisions, subject to reassignment to other industry divisions as the need arose. All of the labor economists on the staff were considered to be available for work in anything within the range of their capabilities and the type of work for which they were employed, which the Office of Manpower Requirements or one of its divisions needed to do. The functions of a labor economist in the Construction and Utilities Section of the Equipment and End Products Branch of the Division of Labor Requirements were the same as the functions of a labor economist of similar grade in another section, except for the industries with which the section was concerned.
The Employing Officer, during his initial interview with plaintiff[8] told plaintiff of the nature of the Office of Manpower Requirements and the work of their division, including the organizational structure and the relationships between the Office of Manpower Requirements and (1) other Offices such as the Office of Labor Production[9] within the War Production Board, and (2) other agencies and departments, such as the War Manpower Commission and the Departments of Commerce and Labor. The work of the Employing Officer’s division contemplated constant dealings with the other Offices, agencies and departments above named.
11. In the administrative echelons of the Employing Officer’s division there was, between him as Chief of the Division, and the labor economists, a Branch Chief to whom the labor *152 economists were to report. Under the supervision and direction of the Branch Chief, the labor economists were assigned the task of preparing information and recommendations concerning manpower problems in war production.
The information that they were asked to obtain was essentially whether or not there was a manpower shortage or surplus in a specified industry, and if there was a shortage, to ascertain the cause thereof and what, if anything, could be done to overcome it. They were asked (1) to check certain products, or certain localities, or certain industrial plants, and (2) to get the necessary information from the War Manpower Commission or from the Departments of Labor, Commerce, or Agriculture, or from the Planning and Statistical Division of the War Production Board. When they had compiled all of the statistical information that was available, they were to make a qualitative analysis of the data. They were expected to explain whether the manpower shortage was due to a lack of population in an area or the refusal of employers to hire women or negroes, or whether the shortage was due to a great turnover, high absentee rate, or due to a strike or dispute between employer and labor. Then they were to recommend what should be done to alleviate the difficulty.[10]
12. It is not established by the evidence (1) that the functions described in finding 11 were fully explained to plaintiff by either the Employing Officer or the Branch Chief; (2) that plaintiff lacked either information or understanding of such functions, or the part he was to perform in connection therewith, for more than a few days after his employment; or (3) that any lack of information or understanding *153 on tbe part of plaintiff, of the functions described in finding 11, or of his duties in connection therewith, caused or contributed to the difficulties subsequently encountered by him.
13. Within less than two months after plaintiff began work, the Employing Officer received three reports reflecting adversely upon plaintiff’s ability to meet and deal with other people.
In each instance the Employing Officer asked for and obtained plaintiff’s explanation of the incident. In each instance the Employing Officer found (1) that the facts were not materially in dispute between plaintiff and the complainant; (2) that plaintiff insisted that his conduct and course of dealing had been right and the complainant’s had been wrong; (3) that, based on plaintiff’s own version of what had occurred, plaintiff’s actions had not been above question, or even reproach, from the standpoint of courtesy, tact, and cooperation; and (4) that plaintiff was argumentative in defending his position against the criticism of (a) the complainant and (b) the Employing Officer.
14. In concluding the third of the interviews described above, the Employing Officer told plaintiff (1) that from plaintiff’s own accounts, there were situations in which it appeared that plaintiff had not handled himself with proper courtesy and tact; (2) that if plaintiff felt that he was in the right and other people were in the wrong, the Employing Officer would make a formal disciplinary case of the situation and both sides would be heard; (3) that if plaintiff were shown to have been discourteous and tactless, he would be released from his job; (4) that if he were found not to have been discourteous, he would be continued in his job, and the division would insist that the other Offices and agencies change their attitudes; (5) that if plaintiff did not want to go through with this sort of hearing procedure, the Employing Officer would give him another type of work in which he would have nothing to do with the outside public, but would do straight research work from records; (6) that he, the Employing Officer, was convinced from plaintiff’s own story that he was not competent to deal with other people; and (7) that if plaintiff disagreed with the judgment and conclusion of the Employing Officer, a hearing on that issue would be arranged and both would be bound by *154 the results. Plaintiff considered the matter and elected to take a new assignment in straight research work.
15. Some time in the early part of January 1944, plaintiff was given a new assignment, which was confined to research work and involved the minimum necessity of dealing with other people. It consisted of making digests of reports on manpower, which were intended to save time for other staff members in searching out and reading reports.
16. As a result of a skin infection plaintiff became unable to work and was absent from his job from January 12 to February 29, 1944. During this illness the Employing Officer (1) visited plaintiff at his quarters and offered him assistance, and (2) took such steps as were necessary to have plaintiff’s name retained on the employment roll, in the status of leave-without-pay, after the expiration of plaintiff’s accumulated annual and sick leave.
17. Plaintiff received an efficiency rating of “Good” for the three-month period from November 15,1943, to February 14, 1944. The Report of Efficiency Bating was signed on February 16,1944, by the Branch Chief as rating official and by the Employing Officer as reviewing official. Both signatures were affixed immediately beneath (1) the question: “On the whole, do you consider the conduct of this employee to be satisfactory?” and (2) the answer “Yes”.
18. Within three months, more or less, from the date of the efficiency rating described in the preceding finding, the Employing Officer found and concluded (1) that plaintiff, in the preparation of digests, was occasionally interpolating his own opinions in such manner that digests so interpolated did not accurately summarize the ideas of the authors of the reports digested; and (2) that the digests, even when accurately prepared, did not warrant their cost because of the ever changing functions and methods of the Office of Manpower Requirements. Some time in May 1944, the Employing Officer told plaintiff (a) that the preparation of the digests would have to be discontinued; (b) that there was no other work in the Employing Officer’s division to which plaintiff could be assigned; (c) that plaintiff should find other employment and transfer thereto, or resign; and (d) that a reasonable time would be allowed within which plaintiff might look for another job.
*155 19. Plaintiff received an efficiency rating of “Good” “based on performance during period from February 15, 1944, to May 14,1944.” The Report of Efficiency Rating was signed on May 26, 1944, by the Employing Officer as the rating official, and on May 29, 1944, by the Deputy Vice Chairman as reviewing official. This Report did not contain the question and answer recited in finding 17. The elements on which plaintiff was rated, with the underscoring and marking thereof, follow:[11]
procedures. -I- * * * Skill in the application of techniques and
Attention to broad phases of assignments. * *
Accuracy of final results. *
Accuracy of judgments or decisions. *
Effectiveness in presenting ideas or facts. *
Industry. *
Amount of acceptable work produced. * *
Ability to organize his work. * *
Effectiveness in meeting and dealing with others. * *
Initiative. * * *
Resourcefulness. * * *
Dependability. * * *
20. In July 1944, the Employing Officer told plaintiff that a definite time would have to be set for his termination, either by transfer or resignation, and specified a date in August, more than 30 days later. Plaintiff then asked, as he had done before, and as he requested later of the Employing Officer’s administrative superior, more time in which to locate other employment.
*156 21. (a) On August 10, 1944, the Deputy Vice Chairman signed a memorandum of advice to the Director of Personnel of the War Production Board stating that “The Manpower Requirements Office will release for transfer [plaintiff] * * * whose conduct and efficiency have been rated and reviewed by the proper officials below.” The memorandum stated that plaintiff was available for transfer at any time.[12] The second section of the memorandum was signed (on August 9, 1944) by the Employing Officer (as the Immediate Supervising Official) and (on August 10, 1944) by the Deputy Vice Chairman (as Reviewing Official), and stated that, based upon previous efficiency ratings, the comment which most nearly described plaintiff’s performance was—
GOOD: This employee has done all that is required in his job in a competent manner, and everything considered, has rendered satisfactory service. * * * The employee’s conduct has been satisfactory.
(b) On August 16, 1944, plaintiff was given two separate referral slips directed to specified individuals, referring plaintiff to be interviewed for the position of economist. Both slips were signed by the Placement Officer of the Division of Personnel Management.
(c) During June, July, and August, 1944, plaintiff made several inquiries, and had some interviews, looking toward other employment. He received no offers of employment.
22. Sometime in August or early September, 1944, the Employing Officer told plaintiff that he would have to resign, or be discharged. In September 1944, the Employing Officer asked the Director of Personnel for instructions as to the procedure to be followed to bring about plaintiff’s separation from the employment roll of the War Production Board.
23. During 1944, the War Production Board had in effect a detailed General Administrative Instruction[13] governing resignations, involuntary separations, and suspensions of its employees. This Instruction distinguished between per *157 manent employees, war service indefinite employees, war service trial employees, and war service temporary employees. It defined the terms “discharge” and “termination” and listed seven types of “separation”. The reasons for and methods of discharge, termination, or separation varied according to the category of the employee.
Plaintiff was carried on the rolls of the War Production Board as a war service indefinite employee, which the Instruction defined as—
* * * one who by the nature of his original appointment has not acquired a classified (competitive) civil service status, but who has satisfactorily completed a trial period of service prescribed by the war service regulations of the Civil Service Commission * * *.
A war service indefinite employee could be separated, according to the Instruction, by (1) resignation, (2) retirement, (3) death, (4) military furlough, or (5) discharge because of (a) reduction in force, (b) disability, (c) adverse report of investigation, (d) unsatisfactory service rating, or (e) for cause. A removal for cause could be made, the Instruction provided, “under the provisions of Rule XII of the Civil Service Commission, for any one of a number of specific causes or for the good of the service.” The Instruction purported to quote Rule XII of the Civil Service Commission.
24. (a) The Director of Personnel advised the Employing Officer that plaintiff was a war service indefinite employee within the meaning of the Instruction.
(b) The Employing Officer prepared a draft of “reasons to be furnished,” as required by Rule XII of the Civil Service Commission, and, at an interview with plaintiff on September 16, 1944, showed the draft to plaintiff.
(c) At the time of the interview on September 16, 1944, and on other occasions within the next ten days, plaintiff was urged to resign his position. He considered the course, but finally refused to do so.
25. On September 26, 1944, plaintiff addressed to the Director of Personnel a memorandum[14] reciting that he had been informally advised that his 10-month efficiency rating *158 would be only “Good”; that the Deputy Vice Chairman had refused to let him state the facts relevant to the efficiency rating unless he first resigned; and that he had asked (and had been refused) the privilege of consulting the office of the Director of Personnel on what he should do under the circumstances. The memorandum closed with a request that the Director of Personnel grant plaintiff a hearing.
26. The Director of Personnel referred plaintiff’s memorandum of September 26, 1944, to the Deputy Vice Chairman. On September 28, 1944, the Deputy Vice Chairman addressed to the Director of Personnel a memorandum[15] in which he (1) acknowledged receipt of plaintiff’s memorandum, (2) reviewed some of the dealings he had had with plaintiff, (3) asserted that the 10-month efficiency rating was “entirely fair”, (4) suggested that plaintiff’s attempt to discuss the efficiency rating was “an effort to further prolong the question of his separation from this office,” and (5) stated that there was no attempt to impair plaintiff’s record, but that “we have gone to extraordinary lengths to allow him to resign and keep his record in good shape for other employment.”
27. On September 28,1944, the Employing Officer (as Director, Manpower Programming Division) addressed to the Director of Personnel a memorandum[16] requesting the removal of plaintiff “from the staff of the Office of Manpower Requirements for the good of the service,” and setting forth a statement “in substantiation” of the request.
28. On September 29, 1944, the Employing Officer addressed to plaintiff a memorandum[17] advising that—
* * * I am requesting your removal from the staff of the Office of Manpower Requirements for the good of the service, and offer the following explanation for the request.
The explanation contained in the memorandum was substantially the same as the statement contained in the Employing Officer’s memorandum of the preceding day to the Director of Personnel (described in finding 27).
*159 The closing paragraph of the memorandum follows:
You are allowed ten days in which to answer the charges in writing and to show cause why you should not be removed from the service. You may also request a hearing of your case.
29. (a) On October 7, 1944, plaintiff forwarded to the Employing Officer a memorandum[18] containing his answer to the charges and showing cause why he should not be removed from the service. Plaintiff’s answers consisted in the main of denials that the incidents related by the Employing Officer had occurred.
(b) Plaintiff’s memorandum contained no request for a hearing on the charges made by the Employing Officer.
(c) Plaintiff made no request for a hearing on such charges prior to final action on his removal by the Director of Personnel.
(d) The Director of Personnel did not order or provide such a hearing.
30. By memorandum[19] dated October 19, 1944, addressed to plaintiff, the Deputy Vice Chairman (1) reviewed the conversations with plaintiff over the past five months and (2) advised him that “effective October 28, 1944, you will be separated from employment in this Office of the War Production Board.”
31. On October 20, 1944, the Employing Officer (as such) and the Deputy Vice Chairman (as Administrative Service Officer) signed a War Production Board Form GA-32 bearing the title “Becommendation for and Report of Separation.” The form recorded their recommendation for “separation by administrative action” by “removal for cause” under section 21 of General Administrative Instruction (finding 46), and advised that they would not reemploy plaintiff.
As completed and filed the Form GA-32 showed (1) that the recommended action was approved by or for the Director of Personnel on October 25, 1944; (2) that the last day of work would be October 28, 1944; and (3) that the effective date and time of separation would be after 4 hours on No *160 vember 20, 1944, at the expiration of accrued annual leave.
32. On October 20, 1944, the Director of Personnel forwarded to plaintiff a Notice of Efficiency Eating marked “10 months” and purporting to be “based on performance during period from 5-8-44 to 9-7-44.” The notice said:
* * * Eating approved by efficiency rating committee GOOD * * *.
* * * Good — Indicates that the employee has done all that is required in his job in a competent manner and, everything considered, has rendered satisfactory service. * * *
33. On October 24, 1944, plaintiff forwarded to the Director of Personnel a memorandum[20] of “remarks” on the memorandum described in finding 30 and quoted in finding 52. These remarks were primarily directed to the refutation of statements contained in the memorandum commented on.
At the time plaintiff’s memorandum of October 24, 1944, was written (1) he had not seen the official Eeport of Efficiency Eating upon which the Notice described in the preceding finding was based, and (2) he believed that his status was such that he was subject to a trial period which would expire on November 14, 1944, one year from the date of his appointment.
Some time within the next two days plaintiff gained access to the official Eeport of Efficiency Eating described in the preceding paragraph.
34. On October 27, 1944, plaintiff addressed to the Chairman, Board of Eeview for the War Production Board, Efficiency Eatings Administration Section, United States Civil Service Commission, a letter requesting that his efficiency rating be reviewed[21] because “* * * The rating and reviewing officials have completely ignored * * * essen *161 tial elements of * * * performance [and] * * * have most unjustly given * * * minus signs on four items * *
35. (a) On October 28, 1944, plaintiff addressed to the Chairman of the War Production Board[22] stating that “At the suggestion of the Civil Service Commission, I am requesting a hearing to clear my reputation.”
(b) The memorandum found its way to the Director of Personnel who forwarded it to the General Counsel, referring to plaintiff as one “who is being terminated today for failure to qualify during his trial period.”
36. October 28, 1944, was plaintiff’s last day of work.
37. On October 30,1944, the Director of Personnel directed to plaintiff a reply to plaintiff’s memorandum of October 28, to the Chairman. The reply said:
Since your case was discussed at length during your visit to my office on Saturday last, I know of nothing further to add in the matter at this time.[23]
38. On October 31, 1944, a War Production Board Form GA-39 entitled “Advice of Personnel Action,” bearing the stamp of the Director of Personnel and signed by the Vice Chairman as Employing Officer, was forwarded to plaintiff. The form stated:
* * * This advice notifies you that the War Production Board has taken the following action with regard to your employment.
Nature of action: Removal.
Effective Date: November 20, 1944. * * *
Remarks: For the good of the service. To be paid thru accrued annual leave which expires after 4 hours on November 20, 1944.
Last day of work: October 28,1944. * * *
39. (a) On November 22,1944, the Chairman of the Efficiency Rating Board of Review for the War Production Board notified plaintiff that his efficiency rating appeal had been scheduled for a hearing before the Board of Review on November 11, 1944.
*162 (b) On November 2, 1944, the official 10-month Beport of Efficiency Bating of plaintiff “based on performance during period from 11-15-43 to 9-14-44” was signed by the Employing Officer (as the rating official) and by the Deputy Vice Chairman (as the reviewing official). Both officials gave plaintiff the adjective rating “Good”. The elements rated, the underscoring thereof, and the markings follow:[24]
procedures. + (3) Skill in the application of technique and
(5) Attention to broad phases of assignments.
(6) Attention to pertinent detail.
(7) Accuracy of operations.
(8) Accuracy of final results.
(9) Accuracy of judgments or decisions. 1
(10) Effectiveness in presenting ideas or facts. +
(11) Industry. +
(12) Bate of progress on or completion of assignments. <
(13) Amount of acceptable work produced. * * *
(14) Ability to organize his work.
(15) Effectiveness in meeting and dealing with others.
— (16) Cooperativeness.
V (17) Initiative.
V (18) Besourcefulness.
— (19) Dependability.
(c) On November 3, 1944, the rating was approved by the efficiency rating committee.
(d) At the time of making this and other efficiency ratings of plaintiff, the Employing Offcer (first as the reviewing official and then as the rating official) understood the regulations governing efficiency ratings to mean and the rating system to require that, after judgment had been applied to (i) the selection of pertinent elements, (ii) the underscoring of especially important elements, and (iii) the marking of elements, the resulting adjective rating should be determined “pretty much mathematically” by addition and subtraction.[25] Similar opinions were held by the Deputy Vice Chairman and the Director of Personnel.
*163 (e) On November 4, 1944, the Director of Personnel forwarded to plaintiff a “revised notification” of his 10-month efficiency rating of “Good.”
40. On November 9, 1944, the Director of Personnel forwarded to the Field Administrative Officer a memorandum as follows:
Before considering the employment of any of the following individuals, Regional Directors or Regional Administrative Officers will first contact the Director of Personnel for clearance.
The names of 14 persons were listed. Plaintiff’s name was one of the 14.
The issuance of such notices was standard practice at the time in the Division of Personnel Management of the War Production Board. An employee listed on such a list might or might not have received clearance for further employment in the event of inquiry. The Director of Personnel would not have given clearance for the further employment of plaintiff by the War Production Board if inquiry had been made. It does not appear from the evidence that such inquiry was made.
41. On November 11 and 13, 1944, hearings of plaintiff’s appeal were held by the Efficiency Rating Board of Review of the War Production Board. The decision,[26] rendered on November 15,1944, sustained the efficiency rating of “Good.” *164 Among the findings on which the decision was based were the following:
While the testimony of the Department with respect to the appellant’s ineffectiveness in meeting and dealing with others during the early part of the rating year was strongly contested, the Board was satisfied that a definite weakness existed in this segment of performance and prevented him from accomplishing the desired objective. * * *
The consideration which influenced the judgments as expressed in the evaluation of elements 16 and 19, “Cooperativeness” and “Dependability” respectively, should more properly have been reflected under element 15, “Effectiveness in meeting and dealing with others.”
42. Plaintiff has received payment of his salary for all of the period worked between November 15,1948, and October 28,1944, and has received payment for all annual leave accrued during such period. Such accrued annual leave expired after four hours on November 20,1944.
43. (a) Plaintiff has been continuously unemployed since October 28,1944.
(b) During his unemployment plaintiff has been primarily occupied with (1) efforts to have the action of the War Production Board in removing him for the good of the service reversed or overruled and the records relating thereto expunged from his personnel folder; (2) the search for other employment in the District of Columbia, in the Government and elsewhere; and (3) the conduct of litigation in various courts, representing himself as a litigant. Plaintiff has consistently believed that much of his effort to reverse the action of the War Production Board and to expunge the record, of which effort a substantial portion of his litigation has been a part, was necessary to the success of his search for further employment in the Government. Such a belief by plaintiff was not unreasonable, although erroneous in part.
(c) The fact that plaintiff was removed from the War Production Board’s employment roll for the good of the service did not constitute and has not been an absolute bar to his further employment by the Government.
(d) The War Production Board maintained a folder in which plaintiff’s personnel records were kept. At an unspeci *165 fied time after October 28, 1944, this folder was removed to the National Archives, where it remains on file. Some, if not all, of the information contained in the folder has been available at all times to the appropriate personnel officials of potential employing agencies of the Government.
(e) Forms in general use by the Government for applications for employment require answers by the applicant to questions relating to previous employment.
(f) Plaintiff has consistently acted upon the belief (1) that answers by him on the Government application forms disclosing his record of removal for the good of the service would diminish his chances of employment and (2) that the existence and content of the records of such removal, and the access of personnel officers to such records, would further diminish his chances of employment. Such a belief on plaintiff’s part was reasonable. It is not established by the evidence that the actions taken by him in consequence of that belief were at all times reasonable.
(g) In some instances, plaintiff’s efforts to anticipate the difficulties inherent in the existence of the record of his removal and to explain the content of that record have created for him more problems than they have solved. By 1948 or 1949, plaintiff had made of his case such a cause celebre that his chances of obtaining further employment in the Government, already diminished by the record of his removal, were further reduced, almost to a vanishing point.
44. (a) Plaintiff’s appointment to the position of labor economist in the War Production Board was authorized and made pursuant to the War Service Regulations, particularly Regulation VIII, of the United States Civil Service Commission.
(b) By his appointment, and during his employment by the War Production Board, plaintiff did not hold a position in the classified, competitive, civil service.
45. It is not established by the evidence:
(a) That plaintiff was not afforded a full and fair on-the-job trial in the position to which he was appointed;
(b) That any of the actions of any of the officials of the War Production Board in removing plaintiff from the employment roll for the good of the service was arbitrary or *166 capricious, or taken in bad faith or as the result of malice or ill will.[27]
46. The General Administrative Instruction of the War Production Board in effect during 1944 relating to resignations, involuntary separations, and suspensions of employees, contained the following provisions:[28]
* * * Section 1. Purpose:
.01 The purpose of this instruction is to outline the rules and regulations governing resignations, involuntary separations, and suspensions of employees from the service of the War Production Board, and the procedure to be followed in order to insure compliance with the .rules and regulations. * * *
Section 3. Definition of Terms:
. .01 A permanent employee is one who has acquired a classified (competitive) civil service status.
.02 A war service indefinite employee is one who by the nature of his original appointment has not acquired a classified (competitive) civil service status, but who has satisfactorily completed a trial period of service prescribed by the war service regulations of the Civil Service Commission, and who has been appointed without limitation as to length of service or for a definite period in excess of 1 year.
.03 A war service trial employee is one who by the nature of his original appointment must satisfactorily complete a trial period of one year of service prescribed by the war service regulations of the Civil Service Com *167 mission before he may become a. war service indefinite employee.
.04 A war service temporary employee is one appointed for a specific period of service of 1 year or less. * * *
.06 Discharge means the involuntary separation of an employee for any reason, including reduction in force, lack of work, lack of funds, termination of military furlough, expiration of leave without pay, unsatisfactory efficiency rating, failure to qualify during trial period, absence without leave, and removal for cause under Regulation YII of the War Service Regulations and Rule XII of the Civil Service Rules.
.07 Termination means the involuntary separation of a temporary, emergency, or part-time employee, because the period of Ms appointment has expired, or because of completion of his work prior to the expiration date of his appointment. * * *
Section 6. Types of Separation:
.01 Any employee may be separated from service by:
1 Resignation,
2 Retirement,
3 Death,
4 Discharge because of reduction in force,
5 Discharge because of disability,
6 Discharge because of adverse report of investigation, or
7 Discharge for cause.
.02 In addition to the above types of separation, per manent and war service indefinite employees may be separated by:
1 Military furlough, or
2 Discharge because of unsatisfactory service rating.
03. War service trial employees may be separated by:
1 Discharge because of failure to qualify during the trial period, or
2 Military furlough.
.04 War service temporary employees may be separated by:
1 Termination because of completion of work,
2 Termination because of expiration of period of appointment, or
3 Discharge because of unsatisfactory service rat-
*168 Section 11. Discharge Because of Failure to Qualify During Trial Period:
.01 A report on Standard Form No. 51 prescribed by the Civil Service Commission, upon the conduct, capacity, and performance of each employee serving a trial period shall be made by his supervisor at least at the close of each 3 months of service during the first year of service. Such a report may be made any time after the first month of service. An unsatisfactory report will be reason to discharge the employee unless the Director of Personnel advises that adjustments may be made to remove the cause of the unsatisfactory service.
.02 If a full and fair trial of not less than one month has clearly demonstrated to the employing officer that a war service trial employee is unfit for the duties of the position to which he is assigned, a report will be made to the Director of Personnel on Standard Form 51. However, no action will be taken by the employing officer to discharge the employee until he has been advised by the Director of Personnel that such action may be taken.
.03 Upon receipt from the Director of Personnel of advice that action may be taken to discharge a war service trial employee, the employing officer will give the employee written notice to the effect that it is necessary to terminate his services because of failure to qualify during his trial period, and specifying the last day of work. Such notice should be given to the employee as far in advance of the proposed effective date as is administratively feasible. The employing officer will then § repare Form OA-32 for distribution as provided in ection 8 of this instruction, and will attach a copy of his notice to the employee to the original of the Form GA-32. * * *
Section 21. Removal for Cause:
.01 Before any action is taken to remove an employee for cause the Employing Officer should obtain from the Division of Personnel Management information as to whether the employee is a permanent, war service indefinite, war service trial, or war service temporary employee so that the case may be correctly handled according to the applicable provisions, of these instructions.
.02 Permanent and war service indefinite employees except those appointed subject to a condition imposed by the Civil Service Commission which has not been complied with, may be removed, under the provisions of Rule XII of the Civil Service Commission, for any one of a number of specific causes or for the good of the service. Rule XII is as follows:
*169 1. Reasons to be furnished — No person in the classified service of the United States shall be removed therefrom except for such cause as will promote the efficiency of the service and for reasons given in writing, and the person whose removal is sought shall have notice of the same and of any charges preferred against him and be furnished with a copy thereof, and also be allowed a reasonable time for personally answering the same in writing; and affidavits in support thereof; but no examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer making the removal; and copies of charges, notice of hearing, answer, reasons for removal, and of the order of removal shall be made a part of the records of the proper department or office, as shall also the reasons for reduction in rank or compensation; and copies of the same shall be furnished to the person affected upon request, and the Commission also shall, upon request, be furnished copies of the same; * * *
4. Power to investigate — The Commission shall have no jurisdiction to review the findings of a removing officer upon the reasons and answer provided for in Section 1 of this rule, nor shall the Commission have authority to investigate any reduction unless it is alleged, with offer of proof, that the procedure required by Section 1 of this rule has not been followed, or that the removal was made for political or religious reasons. The Commission may, however, receive or hear the statement of any employee removed on charges, and may, in its discretion, certify the employee to any other department or establishment for reinstatement to a vacancy in any position for which the employee is qualified, and in the event of such reinstatement the employee shall retain his former status and tenure in the service for all purposes; * * *.
.03 When an employing officer, after such consultations with his superior and the Director of Personnel as he deems necessary, determines that the good of the service requires the removal of a permanent or war service indefinite employee in his unit, he will prepare a written notice to the employee, stating in clear, concise language the charges against him and advising him that he is allowed 10 days in which to answer the charges and to show cause why he should not be removed from the service. * * * The employee will also be advised that any reply which he may make should be addressed to the Director of Personnel. The employing officer will then prepare Form GA-32, and attach copies of his notice to the employee to the original. The Form GA-32 *170 shall contain a notation as to whether accumulated and current accrued annual leave should be granted. * * *
.04 Upon receipt of the Form GA-32, the Director of Personnel will review the case to see that the employee has been properly advised of the action being taken, of the reasons therefor, and of his right to answer. * * * If the Director of Personnel finds that the action is in order, and suspension of the employee has been recommended, a journal will be prepared to report the suspension and the case will then be held to await any answer which may be filed by the employee. If suspension of the employee has not been recommended, the case will be held to await any answer which may be filed by the employee. If no answer is filed by the employee within the ten days allowed, the Director of Personnel, if he has determined that the_ action is in order, will authorize the preparation of a journal to show the discharge of the employee for cause.
.05 If a permanent or war service indefinite employee files an answer within the time allowed, the Director of Personnel will review the facts presented and, if no hearing has been requested, will make a determination as to whether the recommendation of the employing officer should be approved. If he determines that the recommendation should be approved, the Director of Personnel will authorize the preparation of a journal to show the discharge of the employee for cause. If he does not approve the recommendation of the employing officer, the Director of Personnel will prepare a memorandum giving the reasons for his disapproval, will retain one copy to be filed in the employee’s personnel file along with other papers, in the case, and will transmit two copies to the employing officer. The employing officer will retain one copy and forward one copy to the employee. * * *
.06 If a permanent or war service indefinite employee requests a hearing of his case, the Director of Personnel will immediately make arrangements for the hearing in accordance with the provisions of Section 22 hereof. The Director of Personnel may also arrange for a hearing where none has been requested, if he determines that a hearing is necessary in order to develop sufficient facts to enable a final determination on the case.
47. The memorandum which plaintiff addressed to the Director of Personnel of the War Production Board on September 26, 1944, follows:[29]
*171 Mr. * * * has kindly suggested that your attention should be directed to the following situation.
I had been informally advised that, in view of certain alleged rumors respecting my conduct some nine months ago, my 10-montn efficiency rating would be only “Good.” Having thoroughly investigated those allegations and found them totally unwarranted, I requested to be given the opportunity of presenting the pertinent facts for the consideration of my superiors, rather than appealing later for a higher grade.
At an appointment for that purpose with [the Deputy Vice Chairman] and [the Employing Officer] late this afternoon, the former refused to let me state the facts relevant to the efficiency rating unless I first resigned. As no valid reason can be given for such resignation, I requested the privilege of consulting your office on what I should do under the circumstances, so as to prevent my record from being smeared meanwhile with defamatory gossip. This request was likewise turned down.
Will you, therefore, be so good as to grant me a hearing at your convenience, so that my rights and privileges as a faithful employee of the War Production Board may be duly protected ? * * *
48. The memorandum which the Deputy Vice Chairman addressed to the Director of Personnel on September 28, 1944, follows:[30]
* * * I have your memorandum to which is attached a copy of Mr. Levy’s letter of September 26.
There is a long history on this case which at present I will not set down to you in a memorandum except to indicate that our office has for a long time considered that we could not continue Mr. Levy’s services. At least four months ago we advised Mr. Levy that we thought he should find other employment as promptly as he could. We have tried to offer him every opportunity to be placed without interruption to his government employment. The matter finally reached the point where we felt it necessary to ask for Mr. Levy’s separation. Before doing so my staff discussed the matter in detail with Mr. Levy and at that time suggested that he resign. He agreed to do this. At the same time, his ten month efficiency rating was due. He inquired of Mr. Ziskind what rating he would receive and objected when he was told it would be “good.” That rating has been reviewed by me and approved. It is my judgment that the rating is entirely fair.
*172 Since Mr. Levy agreed to resign he has twice been to see me. The first time he recounted in detail his reasons for feeling that his efficiency rating was unfair._ I discussed the matter subsequently with Mr. Ziskind and concluded that the efficiency rating should remain unchanged. The second time he informed Mr. Ziskind and me that he wished to have his rating raised and to withdraw his resignation. Under the circumstances, I felt there was no need for again going over the reasons for our decision.
On the basis of previous discussions we hadwith Mr. Levy it was apparent that his attempt to discuss his rating at this time and his request for more time to consider the problem was an effort to further prolong the question of his separation from this office. The adj ective rating which I approved was the same as we had given him during his entire period of employment here. I do not feel there are any grounds for implying that our office is attempting in any way to impair Mr. Levy’s record. In fact, we have gone to extraordinary lengths to allow him to resign and keep his record in good shape for other employment.
Of course, our office is willing to comply with whatever further review you feel is required in regard to Mr. Levy’s rating, but I am sure that upon examining the case you will agree with me that we have been most generous in our treatment of Mr. Levy,
49. The memorandum which the Employing Officer (as Director, Manpower Programming Division) addressed to the Director of Personnel on September 28, 1944, follows:[31]
* * * We hereby request the removal of Mr. S. Leon Levy from the staff of the Office of Manpower Requirements for the good of the service, and offer the following statement in substantiation of our request.
Mr. Levy was hired as a labor economist in the Labor Requirements Division of the Office of Manpower Requirements. In that capacity he was assigned to the development of materials pertaining to the manpower problems of service equipment industries. More specifically, he was expected to ascertain the manpower requirements of plants engaged in the production of certain consumer durable goods and to determine what, if any, recruitment and Selective Service measures should be undertaken to meet those manpower requirements. In this work he was required to communicate with numer *173 ous officials within the War Production Board and within other agencies of the Government.
Shortly after Mr. Levy commenced his work we received a number of complaints concerning the manner in which he dealt with others. I discussed these matters with Mr. Levy and the substance of the complaints and his explanations may be stated as follows:
A. Someone in the Planning and Statistics Division reported that Mr. Levy was making unreasonable requests for their files and that until an official statement of his activities was presented, further access to the Division’s files would be denied Mr. Levy.
_ Mr. Levy told me that he wanted considerable material from the Bureau’s file and in order not to burden the file clerks with his requests, he asked that the Bureau send the files to his office. He was of the opinion that since he referred to the files more often than the Bureau employees, there was no reason why they shouldn’t be placed in his office. He was not certain of just what was in the files besides the material to which he had referred.
_ B. Mr. Louis Levine, in charge of research and statistics in the War Manpower Commission, advised me that he had received complaints from three of his subordinates, charging Mr. Levy with arrogance and with unwillingness to discuss the reason for his requests for their files. Mr. Levine said he looked into the matter and was convinced that it would be impossible for Mr. Levy to obtain the cooperation of his staff and therefore he suggested that I relieve Mr. Levy of the assignments necessitating his dealing with the War Manpower Commission.
Mr. Levy’s explanation of this incident was that after he had obtained a number of the manpower reports, the WMC clerk in charge of files asked him why he wanted so many of the reports. He refused to tell the clerk because he thought that as long as he was a Government employee, the clerk had no right to inquire. The clerk brought in a supervisor who repeated his request, but Mr. Levy refused to explain his purpose unless he could talk to the head of the section. Mr. Levy was referred to the chief, with whom he discussed the matter. Mr. Levy told me that he explained his assignment and expressed the opinion that WMC had no right to question his motives or to withhold Government records from any Government employee.
C. Mr. Arthur Suffern, of the Office of Labor Production, also complained that Mr. Levy was insisting upon receiving from him and members of the Serv *174 ice Equipment Industry Division data on manpower and production without justifying his need for such information. As a result of their conversations, Mr. Suffern refused to deal further with Mr. Levy.
It was the opinion of Mr. Levy that Mr. Suffern had questioned the propriety of Mr. Levy’s inquiries because he was hostile to the activities of the Office of Manpower Eequirements and that Mr. Suffern was unreasonable and intemperate.
I concluded from Mr. Levy’s explanations that it was futile to attempt to patch the breaches in his relations with the mentioned persons. At the same time, we were short of staff and I felt that Mr. Levy had research ability which we could use if he were not required to deal with outside agencies. I explained this to Mr. Levy and said that if he wished I would give him other assignments in which he would not be permitted to deal with persons in other offices. He considered this and chose to continue his work on that basis.
Thereafter Mr. Levy was given a number of assignments requiring the analysis and digest of literature on manpower problems. These he did adequately. I did not, however, regard that work as a full time job for a labor economist at the P-4 grade. I discussed the possibility of giving him other assignments with our Branch Chiefs, but as a result of their conversations with him, they all concluded that he lacked the necessary tact and cooperative spirit for their work. Other staff members also complained that Mr. Levy was brusque and argumentative. They may have been influenced by the reports of his earlier experiences but the unfortunate fact was that they interpreted his comments to be curt and inconsiderate. Eecently, I requested Mr. Levy to give an oral report at a staff meeting on certain articles he had digested. His report was so poor in quality it caused laughter and ridicule by other persons on the staff.
Approximately in May of this year, I advised Mr. Levy that I could not give him additional assignments and that he should look elsewhere for a job. He asked me if I knew where he might find employment and a day or so later I gave him the name of an employing officer in the Army War College who was looking for research economists. After the lapse of two months, I told Mr. Levy it would be necessary to fix a definite date by which time he must either resign or be terminated, and I set the date a little over a month ahead. When that time came, Mr. Levy said he had a few job possibilities and needed more time. I referred him to Major Hetzel or *175 Mr. Lydenberg and they extended his time. We are all of the opinion that Mr. Levy should not be continued in our employment any longer.
Notwithstanding Mr. Levy’s capacities as a research worker, his lack, of tact in meeting and dealing with others, and the impossibility of maintaining cooperation between him and other members of the staff, has forced me to the conclusion that his services are harmful to our Office. I believe that Mr. Levy might perform ably primary research which requires thorough and painstaking application with few personal contacts. Unfortunately the Office of Manpower Requirements has never been able to offer him such employment. Consequently, for the good of the service, Mr. Levy’s employment should be terminated at once.
50. The memorandum which the Employing Officer ad dressed to plaintiff on September 29,1944 follows:[32]
* * * I am requesting your removal from the staff of the Office of Manpower Requirements for the good of the service, and offer the following explanation for the request.
The work for which you were hired, in November 1943, called for regular communication and cooperation with officials in other WPB offices and other government agencies. Shortly after you commenced work we received a number of complaints concerning the manner in which you dealt with others. I discussed these matters with you, and the substance of the complaints and your explanations may be stated as follows:
A. Someone in the Planning and Statistics Division reported that you were making unreasonable requests for their files and that until an official statement of your activities was presented, further access to the Division’s files would be denied you.
You told me that you wanted considerable material from the Bureau’s file and in order not to burden the file clerks with your requests, you asked that the Bureau send the files to your office. You were of the opinion that since you referred to the files more often than the Bureau’s employees, there was no reason why they shouldn’t be placed in your office. You were not certain of just what was in the files besides the material to which you had referred.
B. Mr. Louis Levine, in charge of research and statistics in the War Manpower Commission, advised me that *176 he had received complaints from three of his subordinates, charging you with arrogance and with unwillingness to discuss the reason for your requests for their files. Mr. Levine said he looked into, the matter and was convinced that it would be impossible for you to obtain the cooperation of his staff and therefore he suggested that I relieve you of the assignments necessitating your dealing with the War Manpower Commission.
Your explanation of this incident was that after you had obtained a number of the manpower reports, the WMC clerk in charge of files asked you why you wanted so many of the reports. You refused to tell the clerk because you thought that as long as you were a Government employee, the clerk had no right to inquire. The clerk brought in a supervisor who repeated his request, but you refused to explain your purpose unless you could talk to the head of the section. You were referred to the chief, with whom you discussed the matter. You told me that you explained your assignment and expressed the opinion that WMC had no right to question your motives or to withhold Government records from any Government employee.
C. Mr. Arthur Suffern, of the Office of Labor Production, also complained that you were insisting upon receiving from him and members of the Service Equipment Industry Division data on manpower and production without justifying your need for such information. As a result of your conversations, Mr. Suffern refused to deal further with you.
It was your opinion that Mr. Suffern had questioned the propriety of your inquiries because he was hostile to the activities of the Office of Manpower Requirements and that Mr. Suffern was unreasonable and intemperate.
From the nature and manner of your explanations of these incidents, I concluded that it was futile to attempt to patch these breaches in relations and that you should not be assigned to further work requiring contact with other offices. At the same time, we were short of staff and I felt that you had research ability which we could use if you were not required to deal with outside agencies. I explained this to you and said that if you wished I would give you other assignments. You considered this and chose to continue your work on that basis.
Thereafter you were given a number of assignments requiring the analysis and digest of literature on manpower problems. These you did adequately. I did not, however, regard that work as a full-time job for a labor *177 economist at the P-4 grade. I discussed the possibility of giving you other assignments with our Branch Chiefs, but as a result of their conversations with you, they all concluded that you lacked the necessary tact and cooperative spirit for their work. Other staff members also complained that you were brusque and argumentative. They may have been influenced by the reports of your earlier experiences but the unfortunate fact was that they interpreted your comments to be curt and inconsiderate.
Approximately in May of this year, I advised you that I could not give you additional assignments and that you should look elsewhere for a job. You asked me if I knew where you might find employment and a day or so later I gave you the name of an employing officer in the Army War College who was looking for research economists. After the lapse of two months, I told you it would be necessary to fix a definite date by which time you must either resign or be terminated, and I set the date a little over a month ahead. When that time came, you said you had a few job possibilities and needed more time. I referred you to Major Hetzel or Mr. Lydenberg and they extended your time by another month. We are all of the opinion that you should not be continued in our employment any longer.
Notwithstanding your capacities as a research worker, your lack of tact in meeting and dealing with others, and the impossibility of maintaining cooperation between you and other members of the staff, has forced me to the conclusion that your services are harmful to our office. An essential element in all the j obs within our office is an ability to maintain effective working relations with other parts of the WPB, to say nothing of other members of our staff. I believe that you might perform ably primary research which requires thorough and painstaking application with few personal contacts. Unfortunately the Office of Manpower Requirements cannot offer you such employment. Consequently, for the good of the service, I am requesting that your employment be terminated at once.
You are allowed ten days in which to answer the charges in writing and to show cause why you should not be removed from the service. You may also request a hearing of your case.
51. The memorandum which plaintiff addressed to the Employing Officer on October 7, 1944, follows:[33]
*178 I* SUMMARY
(a) I am surprised at your mention of “charges”. Did you not tell me a few days ago that you did not intend to bring any charges against me, and that you merely wished to terminate the job of digesting reports?
(b) In accordance with your wishes, these Digests have already been discontinued. I am now engaged on a comprehensive report entitled “A Panoramic Survey of Industrial Womampower”, a rough outline of which was submitted to you a month ago.
(c) Is it not true that your so-called charges relate only to the earliest phases of my employment here, about ten months ago, when procedures were quite unsettled and instructions ambiguous, and that virtually nothing of the slightest derogatory nature has occurred since then ?
(d) Is it not a fact that after you called me into your office on January 8, 1944 and listened to what I had to say regarding the telephone calls, you asked me to “forget” about those “complaints”, deemed it unimportant to investigate further, and prohibited me from calling upon the parties involved so as to prove conclusively that my conduct had been irreproachable?
(e) It will also be admitted that for more than nine months you have not had occasion to reprimand me even once for the slightest misconduct. If this is denied, I should like to be advised of concrete illustrations to the contrary.
(f) When you authorized me for the first time only a few days ago to investigate thoroughly the nature of the “complaints” which had been dismissed nine months ago, did I not on September 26,1944, endeavor to lay all the pertinent facts on the table for the consideration of yourself and Major Hetzel, so as to avert the present mess? Can you, then, blame me for being “argumentative” in refuting now the so-called charges, after I had been on that date formally denied the privilege of stating precisely the facts with special reference to the 10-month Efficiency Eating?
XI. DETAILED REFUTATION OF CHARGES
A. Mrs. Eichardson
(1) The most serious charge described under caption A of your memorandum begins with “someone”. Is it not remarkable that you have thought it expedient to *179 avoid mentioning tbe name of the alleged plaintiff? What was your motive in concealing it?
(2) You appear to attribute most of your information to me. On September 16 you showed me a similar memorandum of charges which you proposed to take up with Mr. C. C. Conn. That memorandum, I think referred to “an entire file cabinet of documents.” The present memorandum refers to “files”. Do you ascribe this revision to me also ?
(3) On September 16,1 was amazed to see this charge for the first time, and was infinitely more shocked to find that it was stated, as if it were an ascertained matter of fact, by one in whose integrity I had complete confidence. But in self-defense, I was obliged to tell you in the presence of Mr. John Lydenberg that the story had been made out of whole cloth. Your insistence upon repeating that yarn notwithstanding all my protestations against it, impels me to deny that there ever was the least foundation for it.
(4) I would require a good psychoanalyst to exploit the motives of an administrator, who took advantage of his position to blackball an innocent subordinate, by imputing to the latter statements that were never made with reference to an event that never occurred. In the interest, however, of unadulterated veracity l am bound, under the circumstances, to make the following assertions.
(a) I never requested permission to see the files in the Planning and Statistics Division.
(b) I never had access to any of such files.
(c) I never was in the office where they were located.
(d) I never saw or talked to any file clerks or anyone else about them.
(e) I had no space in my office for the placement of such files.
(f) It never occurred to me to make such a request.
(g) I never told you anything even remotely resembling the statement which you have ascribed to me.
(5) What I did tell you was very simple. I said that I had telephoned Mrs. Richardson in regard to a certain pamphlet put out by the Planning and Statistics Division which she promised to send over to me; that she later called up Mr. Borders about it, and that the latter suggested that the desired documents be obtained through Mr. Ozer. “Ozer?”, you remarked, as if not satisfied with that procedure. Nothing further was ever mentioned about the matter until the fatal September 16.
*180 (6) From the viewpoint of a candid inquirer it would appear: First, that any employee who could have made such requests as you have described, or, worse yet, offered the kind of explanation alleged in this connection, would have displayed unmistakable evidence of a distorted mind rendering him a potential menace to his associates. Second, that any administrator who heard of such an imprecedented complaint accompanied _ by such a monstrous explanation and did not immediately take steps to expel such a maniac from the organization, would have been guilty of gross dereliction of his duties.
(7) The following correspondence between Mrs. Eichardson and the present writer throws light on the alleged “charge.”
SEPTEMBER 25, 1944.
Mrs. Jane W. Eichardson,
Secretary to Mr. Stacy May, Boom 5700, Social Security Buildina.
Dear Mrs. Eichardson : You may recall that at the suggestion of Mr. Seiger*, I had called you up on the telephone once or twice last December in reference to a publication supposed to contain an inventory of available statistics.
I happen to have “Analysis of Use of WPB Forms” dated April 11,1944, which Mrs. Eussell in Mr. Enquist’s office has lately been good enough to send me. I’m not sure whether the inventory referred to in my original request # had reference to the “Analysis”. At any rate, I’ve never seen a publication from your office under the caption given in the sentence above.
It may be surprising to you that I have been accused of making an unreasonable request of sending down an entire file cabinet from your office to mine. To me, this accusation sounds preposterous. If I had ever made such an unreasonable request, you would undoubtedly remember it. If, on the other hand, you can honestly state that no such crazy request was ever made by me, please so note.
In anticipation of your courtesy, I am,
Sincerely yours,
eb (Signed) S. Leon Levy.
Notes. — *Mr. Benjamin M. Seiger, formerly Assistant Chief, General Statistics Staff, now Assistant Director, Textile, Clothing and Leather Bureau.
# Mr. Seiger has advised me that his suggestion did refer to the “Analysis” which was then in the process of being prepared.
*181 War Production Board
Office Memorandum
9/25/44.
To: Mr. S. Leon Levy.
From: Jane Richardson, Secretary to Stacy May, Bureau of Planning and Statistics.
Subject: Request for Materials.
I remember talking to you a long while ago but do not recall just what the details of the request were. However, I am sure that there were no ill feelings about the matter.
I have never been asked by anyone for an entire file cabinet of materials.
(Signed) Jane Richardson.
(8) Goodness only knows how I have done everything within my power to avert the present mess. Immediately upon receipt of Mrs. Richardson’s reply and before knowing of your current memorandum, I showed you the foregoing correspondence. Disgustingly you remarked, “I don’t care what Mrs. Richardson says. This is what I say. Let them overrule me.” You suggested that I confer with Major Hetzel in your presence. But though the latter was good enough to grant me an appointment for four o’clock on September 26, he refused to give me even five minutes for stating the pertinent facts in the case. It is hoped, however, that the following memorandum by my former Branch Chief, who must have told you something about Mrs. Richardson’s call, will serve to alter your viewpoint with respect to this alleged offence.
2 October 1944.

To Whom It May Concern:

I have been asked to recall the circumstances of some conversations of Mr. S. Leon Levy who was at the time of the instance involved working under my direction in the Office of Manpower Requirements of WPB.
This occurrence was some ten months ago presumably about December 1943, and I do not therefore remember the circumstantial details. Mr. Levy was at that time engaged in work concerning manpower problems concerned in the Consumer Durable Goods Branch. In the course of his search for pertinent data he apparently made a telephone call to the Bureau of Planning and Statistics requesting a certain document. He was referred to Mr. Stacy May’s secretary, Mrs. Richardson. Mrs. Richardson in turn called me and raised some *182 questions as to tbe routing of material of tbis sort and as I recall it she suggested that it flow through one responsible person through the manpower divisions rather than to individuals engaged in special enterprises. I do not recall any disparaging remarks concerningMr. Levy. As I remember it I thereupon called Mr. Levy and suggested that he secure the information through Mr. Ozer who is in charge of Research and Statistics in the Manpower Requirements Division.
(Signed) Kabl BoedeRS.
United Nations Relief and Rehabilitation Administration, 1344 Connecticut Avenue NW., Washington, D. C.
Decatur 7300
B. Mr. Levine
(1) I admire your technique and vividness of style in building up a strong case against your defendant whom you have portrayed as a devilish, argumentative, and arrogant sort of creature, always getting into all sorts of scraps with employees of the WMC; starting an altercation with a clerk by refusing to answer him a proper question, quarreling again with that clerk’s supervisor and insisting upon appealing the case to the head of the department only to take a most arrogant attitude even towards the latter, which inevitably results in an explosive outburst of resentment and opposition. How illuminating a picture of incompatibility and unfitness for the job, if only it were true! In reality, however, it is largely based’ upon your preconceived conclusions.
(2) One can readily forgive you for confusing, after the lapse of ten months, unconnected information applicable to entirely different occasions. But when you accuse me of speaking arrogantly to the clerk’s supervisor and again to Mr. Levine himself, you know definitely that such allegations are absolutely false. I don’t see how you could remember all those details and forget the main fact of which I took pains to inform you on that occasion. I told you that the clerk’s immediate supervisor, Mr. Emich, from whom authority for the requested data had to be obtained, as a matter of routine procedure, was absent. That’s why I was referred to Mr. Levine, whom I had never met, who was likewise away from his office, which made me leave the list of companies on which information was sought with Mr. *183 Levine’s secretary. I still have my original note, which states as follows:
12-29-A3.
Left with Mr. Levine’s secretary list of companies on Office Machinery to put code numbers. Weiss busy for three days.
(3) You leave the impression that I quarreled with Mr. Weiss, the clerk to whom your memorandum refers. That’s also untrue. I left him on amicable terms. When we met casually not long ago he gave me a hearty handshake. It is true that when I gave him the fore-mentioned list of companies on December 29, after I had been working near his office more or less frequently for about a month, he became a little overinquisitive. He wanted to know whether I was working under Mr. Ozer (who I now know had on that occasion held many conferences with Mr. Levine’s organization for the purpose of settling the procedure for obtaining WMC data). I told him, of course, truthfully that I was not working under Mr. Ozer. He desired to know for whom my work was intended. I told him also with truth that it was mainly for my own use, since the work was done at my own initiative with the knowledge and consent of my Branch Chief. He then asked for a justification of my work. Candidly, our plans and procedures were still in tentative form. Mr. Clinton Golden had been urging us to plan for Eeconversion, and I commenced to collect data during my spare periods with that ultimate object in mind. But I felt it imprudent for an employee of the WPB to disclose such confidential information to a representative of another agency. I therefore answered his question in as civil a manner as I deemed it appropriate on the spur of the moment. I certainly did not make such a brusque reply as is alleged in your memorandum. At any rate, that reply had no bearing upon my referral to Mr. Levine. Mr. Weiss himself had no authority to grant permission for securing WMC data from Form 270 reports.
On two previous occasions the procedure was the same. The first time I was referred to Mr. Emich whose permission was duly obtained. The second time Mrs. Allen (the clerk who makes a record of the request and has the proper code numbers inserted) questioned the propriety of doing my work because eight months previously, i. e., long before the Office of Manpower Requirements had existed, somebody in the WPB had requested similar information. Accordingly, I was referred again to Mr. Emich, and since he was too busy, his secretary gave for me the requisite permission.
*184 (4) You will recollect how I begged you on that occasion to let me speak with Mr. Levine whose call to you I could not comprehend, especially since I had never met him. But you said, “No, no! He is a hothead.”
After having obtained from you special permission for the current purpose, I made an appointment with Mr. Levine on September 26, i. e., shortly before I was scheduled to meet with yourself and Major Hetzel. I found him in Naval uniform at the National Office of Selective Service. Mr. Levine distinctly remembered the circumstances of that incident.
“I called up,” he remarked, “and mentioned your name merely as am, example of half a dozen other people in the Office of Manpower Requirements who had been continually asking for various kinds of information. I wanted to put a stop to that procedure. I wanted to establish a liaison officer between the WPB and the WMC for the procurement of such data.”
“Did you,” I asked, “have any grievance against me in particular?”
“Not the least,” he responded. “I did not know you from Adam!”
And yet all these months I have been more or less repressed by you, and subjected' to derogatory gossip, by reason of a bagatelle that might have been readily removed, had I been privileged to talk the matter over with Mr. Levine. Is it not a pity that such a mountain has been produced from an insignificant ant-hill 1
C. Mr, Swjfern
(1) In reference to Mr. Suffern, permit me to assert that, on the basis of the official record with which you are undoubtedly not conversant, I performed the duties assigned to me strictly in accord with the instructions from my supervisors. While Mr. Karl Borders was my Branch Chief, he designated Mr. George Simpson as my guardian angel, so to speak, whose detailed instructions on procedures I was supposed to follow, subject to review in doubtful matters by the Chief himself. Both Mr. Borders and Mr. Simpson emphasized unreservedly that, though I was supposed to cooperate with Mr. Suf-fem, the assignee for the Service Equipment Division, to the best of my ability, my primary function was to carry out the policies of the Manpower Requirements Office with no subservient attitude to Mr. Suffern. In other words, instead of taking orders from Mr. Suffern, I was supposed to be governed by instructions from my own supervisors. Mr. Suffern, however, had a different conception of his relation to me. It was his understand *185 ing that I was to be his assistant, and as such had no business even to request him for data. Accordingly, if it was proposed, for example, to revise a Limitation Order of the Service Equipment Division and he felt satisfied with the revision I had to act, in his opinion, as his mere rubber stamp insofar as it might affect our own Office. If I made any effort to inquire independently of his own views on the matter, he resented, grumbled and raved. As soon as this attitude on his part was discovered, I reported it in unambiguous terms to my Chief. Accordingly, item 6 of my Progress Report for the week ending December 24,1943 stated as follows:
It should be noted that the growing frigidity, insolence and downright rudeness on the part of the as-signee constitute a distinct handicap in the efficient performance of our duties. His non-cooperative, grumbling attitude, is due partly to a constitutionally irritable temper, the effects of which are felt more or less by all of his colleagues, and partly to unwarranted jealousy and resentment growing out of a misconception as to his powers and functions which definitely require to be corrected.
(2) You have condemned me to eternal damnation, from an employment or administrative viewpoint, by reason of Mr. Suffern’s complaint that I was making unreasonable requests for production data, etc. It, therefore, appears that Mr. Suffern’s mere assertion that they were unjustifiable was enough to convince you that they actually were so. You have forgotten, however, to take cognizance of the fact, as stated previously, that you had assigned me to Mr. Karl Borders, and it was my duty to be governed by the instructions from my Chief or whomsoever he designated to be my guide.
There were only two instances oh which Mr. Suffern’s views differed from mine, and in each case my superiors commended my attitude and even proposed to go to higher authorities for its support. Let the official record, however, speak for itself.
First Case: In the middle of December, 1943, Mr. Simpson and I were asked to review a proposed revision of Limitation Order L-54r-c on office machinery, which increased inventories after December 31, 1943. We both agreed that in order to determine whether or not a manpower clause was needed in the proposed revision, it would be necessary to have some comparable data for the companies to be affected by such a Limitation Order. Accordingly I was instructed to talk to Mr. Suffem about it. In His opinion no such data were required because he felt the revision would have no effect *186 upon manpower, but he showed me no data in support of his viewpoint. He consented, however, to let me go over to the Service Equipment Division, and telephoned the official in charge of the required data so that I could see him by appointment. That official appeared to be cooperative and assured me that whatever data I needed could readily be made available for my use if only Mr. Burleigh, his Director, would authorize him to do so. But the latter refused such authorization because, in his opinion, those data were not necessary for my purposes, especially since Mr. Suffern had agreed with him on that score, and it was his understanding that I was Mr. Suffern’s assistant.
Under date of December 18,1943,1 submitted a memorandum to Mr. Borders stating that, in view of the absence of data in respect to the proposed method of computing inventories, I was unable to express an opinion as to the desirability of inserting a manpower clause. I added: “Mr. Suffern as well as Mr. Burleigh may be satisfied, but I have no basis for being satisfied or unsatisfied.”
Thereafter Mr. Borders suggested that I draft a memorandum to Mr. Suffern under your signature. This I did in the proposed memorandum dated December 20, 1943, and put it on Mr. Borders’ desk. He noted on the carbon copy “Call Suffern for meeting.”
Under date of December 27,1943 I left the following note for Mr. Borders.
Mr. Simpson has suggested that instead of my previous memo addressed to Mr. Suffern under Ziskind’s signature, a similar one should be addressed to Mr. Seltzer under my own signature.
Such a memorandum, with the approval of both Mr. Simpson and Mr. Borders, was promptly dispatched on the same date. That memorandum completely ignored the absence of data or any discussion relative to the difficulty of obtaining them. It merely proposed certain provisions intended to protect our explicit policies concerning labor shortage areas.
Second Case: After appropriate discussion with Mr. Borders, I submitted for the latter’s approval a memorandum dated December 22, 1943, addressed by myself to Mr. Suffern, requesting him to obtain for me from the Service Equipment Division certain data, so as to render myself as helpful as possible to the activities of that industry division. In the opinion of my Chief, that memorandum contained an outline of most valuable information. “There is nothing you can do here,” he remarked, “that is of greater significance than what you *187 have outlined.” But be objected to making the request in the form of a memorandum. He suggested that I should see Mr. Suffern personally and try to convince him of our need for such data, and that if he declined to cooperate with us, Mr. Borders might have to proceed to somebody higher up.
I followed Mr. Borders’ suggestion and tried to talk to Mr. Suffern in as nice a way as possible, but he refused even to consider the matter.
(3)1 am totally at a loss why you have chosen to refer again to Mr. Suffern, in view of the fact that your own opinion of him ten months ago was very bad, and you repeated to me only a few days ago that Mr. Suffern’s record was notoriously abominable. You are aware of the difficulties which Mr. Simpson and Mr. John Shott have had with him. You must also be aware that Mr. Buckley was once obliged to go above Mr. Suffern’s head, and that Miss Jacobi was at one time so abused and insulted by the latter that his chief had to come down and apologize to her for his subordinate’s misbehavior. So, in the name of common sense, why do you still persecute me in consequence of a situation that never required an apology on my part?
D. Your Original Reaction to Incidents Discussed, with Me January 3,1944*
Referring to the third paragraph on page two of your memorandum commencing with the phrase, “From the nature and manner of your explanations ox these incidents,” permit me to refresh your recollection of your actual decision on that very occasion.
In the first place, you remarked: “This is the way I operate. I can make an investigation, and if I find you
giilty of conduct unbecoming an employee of the War roduction Board, I could fire you. Or I can ignore these matters altogether and give you another assignment. Now, which method do you prefer?”
I answered, “Do as you please. My conscience is clear.”
“Well,” you continued, “I don’t care to make an investigation. Suffern I know is hard to get along with. Everyone who contacted him complained. As regards Mr. Levine, did you ever meet him?”
“No, sir,” was my response.
“Well,” you said, “he is a hothead. So let’s forget about this matter. I’ll give you another assignment.”
“Would you,” I asked, “permit me to see Mr. Levine? I should like to talk to him. I’m sure if he saw me face *188 to face, the situation would be cleared to our mutual satisfaction.”
“No, no!” you insisted.
“I might have to go to the War Manpower Commission even in connection with other assignments,” I pleaded.
“You may be able,” you said, “to get what you want through other people over there, without going to Mr. Levine.”
“Well,” you proceeded, “let’s not talk about this matter again. We have an important problem now. The Small War Plants Corporation has asked that small business firms should be released from all WPB restrictions. I want you to investigate and give me a thoroughgoing report on the matter. Perhaps the first thing you ought to do is to go to the Library of Congress and. obtain a complete bibliography.”
The foregoing conversation, as you know, took place in your office about 9:30 A. M., January 3,1944. I still have a memo of it. Within a few minutes I set to work on the subject with two clerks, one in the OEM Library and another in the Legal Library. By noon I had a stack of documents on my desk about a yard in length. In tibe meantime I had communicated by telephone with a number of officials in various agencies, such as the War Department, the Department of Commerce, and the United States Chamber of Commerce. Within a few days reports commenced to pour into my office. I think I showed you once about a dozen of them, and you commended my promptitude in taking care of the situation. Though my assignments have changed from time to time, I have been continuously in contact with innumerable people in dozens of Government and private agencies ever since that occasion in the infancy of my employment with the War Production Board.
E. Reactions of Bmnc'h Chiefs, Etc.
(1) The fourth paragraph on the second page of your memorandum states that all our Branch Chiefs conversed with me regarding the possibility of my being assigned directly under them and found me undesirable by reason of my non-cooperative spirit, etc.
Permit me to assert in the first place, that since I have worked here it never occurred to me to discuss such a possibility with any Branch Chief. But in view of your declaration, I have taken the liberty of interviewing every Branch Chief on that score. The upshot of these interviews is that none of them has the slightest grievances against me. One Chief was puzzled by my inquiry. “Why,” he remarked, “we have been working *189 on separate floors. I never had occasion to require your cooperation, except once when you let me use your telephone.” Another Chief likewise was surprised by my inquiry. “I am confronted with the problem of reducing mv staff. How could I have considered the question of taking you ? ” He chuckled at the inquiry about cooperation. “It reminds me,” he said, “of Kingsley’s Water-Babies. It is firmly declared that ‘water babies’ are actually in existence, unless one could bring forth undeniable evidence to the contrary. So, you too, are required to disprove malicious allegations.” One Branch Chief was decidedly unfavorable to me. I asked him, why ? He referred to gossip which I could readily trace to yourself. Your own statement, “they ma/y have been influenced by the reports of yov/r earlier experi-encesconfirmed my suspicion. I said to him: “You cannot be held responsible for what somebody has told you. But in regard to your own relation to me, did you or any of your men ever criticize me for lack of cooperation or any other reason?” He retorted, “there never was occasion; but don’t drag me down.”
Illuminating information on this score is afforded by the following observations of Mr. Ellery A. Foster, who asserted that he was not even consulted in regard to the men that had been placed on his staff.
10/2/44
Mr. S. Leon Levy: In response to your request I am glad to certify for the information of whomsoever it may concern that I have known you casually since you came to the WPB, which I believe was some ten months ago. I have had little occasion to know of or collaborate with you on your official work, because we have been working on separate assignments. However, I have had no occasion to criticize you for lack of cooperativeness, nor have I done so. Nor, to my knowledge, have members of my staff.
(Signed) Ellery Foster.
(2) It seems that you have swallowed every piece of comment, with hook, nail and sinker. Your informants have found me both “curt” and “argumentative” — inconsistent characteristics. Moreover, you yourself, under whose direct jurisdiction I have worked, have shown no disposition to criticize me for alleged transgressions as far as my conduct has related to you personally or in an official capacity.
(3) Speaking of cooperation, you mention no concrete instances. Let me cite some.
*190 (a) At a Staff meeting on .April 3, 1944 you made a solemn announcement that my Digests of various secret and confidential documents would be circularized among our members. You suggested that if anyone desired to have summaries of big reports the material should be turned over to me. At the same time you asked me to address a memorandum to all members of the staff, of course, under your signature, introducing my digests of certain typical investigations in which most members were intensely interested. Within a day Mr. Riley turned over to you for my use a sheaf of numerous preliminary reports in typewritten form which Mr. Saposs had received from the Bureau of Labor Statistics.
Only three days later I submitted to you a comprehensive Digest of these and four other reports covering over 100 pages of text together with an introductory memorandum in accordance with your plan. You scarcely need to be reminded that neither that nor any of my subsequent reports ever was exposed to the light of publicity. Many a staff member repeatedly asked me why I did not let them see my reports. They had the impression that I was secretive, trying to prevent current information from reaching them. Even Branch Chiefs told me they never had the opportunity of seeing any part of my work. Only the other day a Branch Chief remarked, “After listening to your absorbing lecture before the staff I am interested to see what you have written on the various subjects that have engaged your attention.” He felt disgusted, however, to hear that you had never authorized me to spread the gospel to others.
(b) On June 10, 1944,1 addressed a memorandum to you on Full Employment. I suggested that a staff meeting be arranged for the purpose of discussing the matter at- length, and offered my fullest cooperation in formulating a series of questions for the agenda. You deemed it, apparently, inappropriate even to answer my memorandum.
(c) On Saturday noon, July 22,1944, Mr. John Lyden-berg requested me to prepare an address for the following Tuesday morning at the regular staff meeting on “Problems Arising from the Concept of Full Employment.” On July 25, 1944, without a scrap of notes, I gave a graphically illustrated talk for three-quarters of an hour, which, I am told, was quite a revelation to many members of our staff. You yourself praised it highly, but my practical suggestions fell on deaf ears.
_(d) On June 12, 1944, you asked me to revamp and edit Mr. Virgil Bankson’s “Preliminary Report for Full *191 Employment in the Construction Industry.” It was a horrible task. I was obliged to confine myself to limited sources of information, and bring forth order from chaos within the limitations of a preconceived outline. Yet on June 17 it was completed, notwithstanding absenteeism and shortage of clerical assistance. That report was highly praised by you.
(e) On August 21,1944,1 submitted to Mr. Bankson, in accordance with his request, about three dozen Remarks on his revised Report on “Full Employment in Construction,” for which he thanked me profusely. I also offered him numerous suggestions verbally, and called his attention to some important current documents of which he had been unaware. You told me later that my earlier report produced such a good impression that you told Mr. Bankson to re-submit his revised report for the benefit of my criticism.
Two days later, on my own initiative, I submitted a comprehensive review of “Strategic Plans for Reconversion and Full Employment.”
(f) For some months, while you have been too busy to give me assignments, I turned in on my own initiative, with the effective cooperation of numerous officials whom I have contacted, a score of reports dealing with various aspects of manpower requirements, demobilization, cutbacks, civilian programs, labor ceilings, discharged veterans, priority referral programs, reconversion and full employment.
The record shows that many a night I did not leave the office until seven or eight o’clock in the evening. This I was obliged to do in conformity with the safety rules that secret and confidential documents on which I worked could not be taken home, but had to be deposited under lock for the night.
Angie Stern, with your knowledge and consent, was kind enough to place at my disposal many of the confidential documents issued by the Bureau of Planning and Statistics. These bulky reports frequently had to give way to fresher and even more interesting data emanating from numerous other agencies, which kept me steadily busy, notwithstanding the meagemess of your special assignments to me.
(g) Sometime ago Mrs. Hageman requested me to subscribe for war bonds. With little ado she obtained from me $200.00 in cash. She considered it a very liberal contribution to the war effort.
(4) Perhaps the foregoing instances may be construed by you of relatively insignificant consequence. If so, I’d appreciate it if you will kindly call my attention to *192 cases where my cooperative spirit was at fault. I am not ovei’-sensitive to criticism. I welcome it, if well founded, but resent it otherwise. I had rather be criticized by friends than complimented by enemies. I do not consider myself an angel. I have faults and fully appreciate their shortcomings. But I deny emphatically that my blemishes are of such a satanic nature as to justify the proposal of casting me out from the paradise of full employment into the blazing gehenna of a vegetative existence, against which WPB — especially that part of it dealing with manpower — has set its teeth.
(5) Your reference to the May incident is astonishing to me. It is true that on May 1,1944 you suggest that I bear in mind the possibility of an opening with a more permanent prospect, such as the Army Industrial College had to offer. But you have failed to mention the circumstances and real origin of that suggestion, nor your reversed opinion that very day. With your permission, therefore, I’ll endeavor to refresh your recollection of the details incident to that occasion.
Sometime prior to May 1, 1944, you handed me two confidential volumes issued by the Planning Division on “Regional and Industry Impacts of War Production”. Attached to these pamphlets was a note in your handwriting directing me to peruse the material hurriedly and then confer with you as to how I proposed to summarize it. While passing through the hall on the way to the elevator, I made a harmless remark to you that I had been of late living, so to speak, from hand-to-mouth, and that if I only knew what my bailiwick was I could accomplish a lot more for our organization. “O.K.”, you remarked as you entered into the elevator, “let’s get together on Friday,” i. e., the usual appointment day for me. I did not realize until May 1, 1944 that my innocent suggestion produced a train of noxious associations in your mind.
Before proceeding farther, let me pause for a moment and review some of the factors by which your mind had been perturbed. On the one hand, you apparently still considered me tainted by the original sin alleged to have been acquired through the incidents previously described. On the other hand, other rascals in our Office banded together under the CIO Union got under your skin. The entire organization was restless for lack of activity. Meetings were constantly held and petitions for redress circularized, which ultimately resulted in the break-up and reorganization of our Office. You thought, apparently, that your hands were already full *193 with, troubles arising from the unionized committee who could raise heck with impunity. But here was this sinful creature, tolerated and yet inconsiderate, unaffiliated with any union, and therefore deserving no consideration, who also appeared to be tactlessly restless, aggressive and over-ambitious. You probably thought you had already had enough of his crudities, and that he therefore should be forthwith shown where he, in fact, belonged.
As stated before, my assignment was such as to prevent me from proceeding with it before I discussed it with you. I read the material cursorily and tried several times to arrange for an appointment with you but in vain. I suspected that you must have had a grudge against me for no fault of mine. Since you appeared to strike with me, I decided for a while to strike with you likewise, until I became sick and tired of maniana, and called up again for an appointment which was at last granted.
No sooner did I enter your office than you commenced telling me in mournful numbers, not that life was only an empty dream, but that it involved too much preoccupation on your part with more essential matters, such as numerous committee meetings, than the relatively insignificant Digests that had engaged my attention. While suggesting that it might be advisable for me to look around for a more congenial job, you apologized that it was your own fault. You said that when the series of Digests were initiated you contemplated having weekly discussions with me on them. Now, however, you found yourself with little time available for such discussions by reason of more pressing duties. I said that you not only had little time for discussing with me at length, but scarcely to select the documents so as to make them available for my purposes. “That’s quite true,” you remarked. Thereupon I observed: “That’s why I said, if I only knew what my bailiwick was I would save you the trouble of picking such documents for me.”
This remark made you change your mind immediately. “If you’re satisfied with this work, well and good, you may continue with these Digests”. The expression “satisfied” afforded a clue to what had been back in your head during this delay. You must have construed my original suggestion that I was dissatisfied with my assignments.
Now that this misunderstanding was clarified, you becalmed yourself, sat down at your desk and, looking *194 over some of the Digests, observed: “You have a wonderful way of summarizing, only you don’t write_ enough. We want a little more of it.” Parenthetically it should be observed that, instead of “wonderful”, you now begrudgingly and unjustly describe my method as merely “adequate”. I defended myself by reference to Mrs. Hageman’s memorandum dated March 7, 1944, which stated as follows:
Mr. Ziskind has requested that these digests be confined to one page. In unusual instances where you cannot adequately cover the material in a one-page digest, will you please report to him personally any additional information which you feel he should have.
You then instructed me that I was privileged to write more than one page, if necessary.
I requested you again on the same occasion, May 1, 1944, to please state what my bailiwick was and you told it to me. I took a piece of paper from your desk pad with the intention of putting it down black on white. 1 was looking for a pencil and you handed me one. The original slip of paper, which I still have, has the following notation with respect to the bailiwick to which I was then formally assigned:
5/1/44.
Digest
Whatever bears on manpower, cutbacks, and reconversion between now and the end of the war.
Zis.
Nearly two months thereafter, after finishing your remarks respecting the special assignment for revamping Mr. Bankson’s report, you said: “Incidentally, what have you been doing since I last talked to you ?”
My response was: “I sent you two reports in the latter part of last week, and I sent you another one early this week.”
You said that you hadn’t seen them.
With surprise I questioned, “You mean to say you haven’t seen any of my reports during this long interval ? I must have sent you about a dozen of them, and on every occasion I sent it either through my secretary or by special messenger, in accordance with Mrs. Hageman’s instructions.”
Replying in the negative, you immediately pressed the button and Miss Clem entered. Of course, she admitted having received my reports. Asked later why she didn’t submit my reports to you, her reply was that you didn’t see a lot of other things. When a colleague of mine heard of this incident, he observed, “The same *195 old story” — thereby implying that other members of the staff have had similar sad experiences.
F. Oonol/mion
In view of the foregoing facts, I have but three suggestions to offer:
1. That your “charges” be dismissed.
2. That both your memorandum of September 29 as well as the present one by me be stricken out from the personnel record and destroyed.
3. That my efficiency rating be raised in accordance with the actual facts respecting my activities in the previous ten months.
52. The memorandum which the Deputy Vice Chairman addressed to plaintiff on October 19,1944, follows:[34]
* * * Some time in May, Mr. Ziskind advised you that he would probably not be able to continue assigning you to. writing digests and suggested that you should start looking elsewhere for a job. In July, following the reorganization of the Office, Mr. Ziskind informed you definitely that he must terminate the digests, that there was no other position for you in his division, and that he would have to set a definite date at which, if you had not yet found another job, you would either resign or be terminated. You came to me to ask about a position in the other division, and I indicated clearly that there was no opening for you in the office.
At the end of the month’s time that Mr. Ziskind had previously set, you said that you had several job possibilities and that you had no intention-of resigning. Speaking officially, under instructions from Mr. Ziskind and me, Mr. Lydenberg then said that we would give you another four weeks, until September 23, to find a job and that at the end of that period we would have to have you off the payroll. On September 15, you indicated to Mr. Lydenberg that you would not resign on the 23rd. On September 16, Mr. Ziskind and Mr. Lyden-berg again requested that for your own good you resign and extended the period to October 2, exclusive of annual leave. They indicated the steps they would have to take to have you removed if you refused to resign and you wrote a resignation note, apparently convinced that such was the best way.
The following week you asked to see me about your efficiency rating and implied that if I would agree to raise the rating given you by Mr. Ziskind you might *196 resign. I declined to discuss the rating on that basis and restated our position: that if you did not choose to resign we had no alternative but to ask for your separation for the good of the service.
You chose the latter course and Mr. Ziskind accordingly sent you a memorandum explaining his reasons for requesting your dismissal. Mr. Hayward and I carefully considered that memorandum and your reply, and he concurs with me that it would be to the best interests of the service to terminate your employment.
I regret the necessity of taking this step. We gave you every chance to look for another job. We continued to keep you on our staff, repeatedly extending your time in the hopes that you would be able to transfer satisfactorily. We strongly urged you to resign without prejudice to prevent the unpleasantness accompanying a termination. Now, I have to inform you that effective October 28, 1944, you will be separated from employment in this Office of the War Production Board.
53. The memorandum which plaintiff addressed to the Director of Personnel on October 24,1944, follows:[35]
* * * Eemarks on Major Hetzel’s letter to me dated October 19,1944
I. First sentence of first paragraph — “Some time in May,” etc. This completely ignores the refutation thereof contained in my memorandum to Mr. Ziskind, dated October 7, 1944, pages 13 and 14.
IL Last sentence of first paragraph. This, again, does not reflect a true picture of what had occurred. Mr. Ziskind told me in July that, notwithstanding the fact that he wanted the Digests (“I want them”, he said emphatically) , he could not have them because he no longer had charge of research. I asked him, who was in charge of research. He replied that Major Hetzel took over that function, and suggested that I see the latter.
Major Hetzel stated that his Office was obliged to reduce its personnel by reason of an imposed ceiling, (which Miss Matteo later denied to be true) and he felt that by reason of my efficient qualifications, I would probably find it much easier to locate myself elsewhere than others. He asked me to report to him about the situation within a week, suggesting at the same time to “toot my horn”, i. e., not to be too modest about my qualifications. He said, moreover, that he did not wish to penalize anybody, and if nothing turns up within a week *197 or so, lie would try to see what could be done in my behalf.
III. Second sentence, second paragraph. Mr. Lyden-berg told me that if I did not find a job by September 23, and refused to resign, I would be given an “unsatisfactory” efficiency rating. I reported this threat to Miss Matteo. She told me: “Your record is good; don’t you resign!” She suggested that I see Mr. Conn. The latter told me that if they gave me an “unsatisfactory” rating, they would have a lot to explain, in view of my good record up to July 11, when the release was issued. I told Mr. Conn that Mr. Ziskind wanted to terminate my services because he was obliged to discontinue my Digests. _ “If so,” he said, “that is tantamount to a reduction in force, and they cannot tell a P4 to quit on that account; it is up to the personnel office to decide who is to be discharged in that case.” After reviewing my record he advised me to “sit tight.”
It was only after they had been informed they could not give me an unsatisfactory efficiency rating, that the expedient of trumping up “charges” against me appeared on the surface. Since there was absolutely nothing for which they could criticize me during the last 10 months, they tried to grab something that had long been dismissed and forgotten.
IV. Last sentence, second paragraph: “apparently convinced” etc. How diametrically opposed to the actual fact! Late on Saturday September 16, I was called into Mr. Ziskind’s office and in the presence of Mr. Lydenberg was shown a proposed letter addressed to your office which requested my dismissal by reason of alleged misbehavior on my part during December 1943. I was shocked to see such charges for the first time, and with due deliberation I told Mr. Ziskind in Mr. Lydenberg’s presence that one charge in particular had been made out of whole cloth. Since Mr. Ziskind threatened to send the memorandum to you in spite of my protestations, unless I resigned right on the spot, I said you want me to sign voider duress, well and good, give me a piece of paper and I will sign my resignation. After he got from me the piece of paper, I said to Mr. Ziskind: “Now I want you to tear up those papers in my presence.” Without uttering a word he immediately did tear up his proposed memorandum to you in respect to charges against me!
At the earliest opportunity I protested to Major Hetzel about this procedure which threatened me with blackmail unless I signed that resignation. I told him, *198 of course, that that resignation having been forced upon me was not worth the ink with which it was written. A typewritten statement on Form GrA-31 (which I still have) was submitted to me for my signature, which I refused to sign, in accordance with Mr. Conn’s advice.
V. Third paragraph. This is not only untrue. It is a monstrous perversion of the actual facts. The author of Major Hetzel’s memorandum, Mr. John Lydenberg, admitted his guilt in this connection and indicated his willingness to revise it, if only it were possible to take back the copy that had already been sent to your office! The real facts are as follows :
On September 26, I showed Mr. Ziskind the correspondence between Mrs. Richardson and myself bearing upon the former’s alleged complaint. As stated on page four of my memorandum to Mr. Ziskind dated October 7, 1944, Mr. Ziskind remarked that he did not care what Mrs. Richardson had to say on the subject, and suggested that I take the matter up with Major Hetzel. The latter granted me an appointment for four o’clock that day. In the meantime I was privileged to confer with Mr. Levine (as per my memo of October 7, pages 5 to 6), so that by four o’clock I was ready with all the pertinent facts in the case.
Major Hetzel insisted that our conversation take place in the presence of Mr. Ziskind and Mr. Lydenberg and we therefore waited a few minutes for the latter’s arrival. I said I wished to state the facts respecting two related matters. First, that my resignation he can-celled; second, that my 10-month efficiency rating be changed so as to eliminate certain minus-sign items, such as cooperativeness, etc., of which Mr. Ziskind had told me verbally. I hadn’t yet seen the actual official rating which was being retained by Major Hetzel.
Major Hetzel advised me to sign first my resignation on the appropriate form which had been submitted to me, and promised to consider the facts pertaining to the efficiency rating later. I said the question of resignation and the unsatisfactory markings on the Efficiency Rating paper were inseparably connected, and I merely wished to submit the evidence upon which he could base his decision. Moreover, I promised, if the facts warranted my resignation, that I would forthwith resign. Otherwise, I could see no reason for such unprecedented action. Major Hetzel refused to let me state the facts.
I said I was prepared to go into details and be cross-examined to his heart’s content. On the other hand, if time were limited I could do it in five minutes or within the space of a quarter of a page. Major Hetzel still *199 refused to grant me that little time for such, a purpose.
I remarked, my reputation, my career, my very life is at stake, don’t you think I am entitled to a fair hearing? “Why,” I said, “even if I were a criminal I would be entitled to a better, break.” “Let me,” I said, “give you a hypothetical illustration. Suppose you were charged with murder.” The Major chuckled. “Suppose,” I continued, “it is alleged on the basis of Mr. Lydenberg’s testimony that you killed Mr. Ziskind. Now Mr. Lydenberg comes to the court and says, ‘Your honor, I should like to make an important declaration.’ If Mr. Lydenberg is allowed to be heard, you may be freed, otherwise you will be executed. Don’t you think that it is essential for the sake of justice that Mr. Lyden-berg’s statement should be heard?”
Major Hetzel again dodged the question and asked me to decide at once whether I would resign or not. I requested permission to consult someone on the matter. He declined to grant my request. I said, “You wish me to decide on the spot?” “Yes,” he retorted. “This very minute?” “Yes,” he answered. “If that’s the situation,” I said, “it is my unalterable decision never to resign.”
And yet Major Hetzel’s memorandum deliberately attempts to convey the impression, contrary to the obvious facts, that I tried to make an unfair deal with him, promising to resign if he only raised my efficiency rating.
VI. Second sentence, first paragraph on page 2: “Mr. Hayward and I carefully considered the memorandum and your reply,” etc. It is apparent that my memorandum of October 1 was completely ignored, so that regardless of the facts — facts which an impartial tribunal would consider as indisputable evidence — black may be called white and vice versa, merely because my trial period has yet a couple of weeks or so to terminate. Under the circumstances, the position appears to be taken that an innocent and faithful employee of WPB may be smeared, blackballed, deprived of the opportunity to work, live and pursue happiness in accordance with the enlightened constitutional guaranties. In this connection permit me to quote a sentence from President Roosevelt’s address the other day at a dinner of the Foreign Policy Association.
“I happen to believe that, even in a political campaign, we should all obey that ancient injunction — Thou shalt not tear false witness against thy neighbor?
I can scarcely believe that WPB policies approve the practice of making maliciously false allegations against *200 an employee even during his trial period, without affording verifiable proof that can stand the acid test applied by an impartial tribunal.
VII. The other day Mr. Lyndenberg volunteered to submit to me important information which I relayed to Mrs. Belknap, who in turn told it to Mr. Conn. It is my understanding that Mr. Conn considers it so important that I have been asked to incorporate it in the present memorandum. So here you have it.
Mr. John Lydenberg, as Major Hetzel’s alter ego, said I may quote him in respect to the following statement.
Mrs. Lois Outen, Major Hetzel’s secretary, overheard a telephone conversation between yourself and Major Hetzel. You asked the latter whether I should be granted a hearing. The Major left the matter entirely to your own discretion. He himself was indifferent as to whether you did or didn’t grant me a hearing. Now, however, after a hearing has been denied, both Major Hetzel and Mr. Lydenberg regret it. They feel that an injustice has been perpetrated on me by reason of a mere technicality as to an employee’s rights during the trial period.
54. The memorandum which plaintiff addressed to the Chairman of the War Production Board on October 28, 1944, follows:[36]
* * * At the suggestion of the Civil Service Commission, I am requesting a hearing to clear my reputation.
President Boosevelt has recently declared that no one has a right to bear false witness against his neighbor. The evidence is clear that I have been maligned by the Director of Manpower Programming Division who has invented and deliberately misrepresented facts, contrary to WPB policies and procedures.
Mr. Spencer Pitts of the Legal Department, who has gone over the evidence most carefully, has advised me that I am entitled to a hearing.
Mr. John Lydenberg, Major Balph Hetzel’s alter ego, has authorized me to quote him that “a great injustice has been perpetrated by not granting me a hearing.”
Mr. Carlton Hayward’s subordinates have suggested that I write to him, which of course I did but in vain. They as well as I are at a loss to understand his attitude.
Please take action at once, since the time is so limited.
*201 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and his petition is therefore dismissed.
Judgment is rendered against the plaintiff for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.

 Plaintiff was born In Russia in 1886; came to tbe United States in 1899; and was naturalized in 1915. He received a B. A. degree from the College of the City of New Vorh in 1908, and a Ph. D. from Columbia University in 1911.

 The United States Civil Service Commission has advised plaintiff that: “* * * You completed the probationary period and were retained by the War Trade Board thereafter * * *. Retention after completion of the probationary period confirms absolute appointment in the classified competitive civil service. » * *”

 The certificate bore the notation : “Final approval subject to Investigation.” On July 22, 1944, the Commission notified the War Production Board that “as a result of investigation” plaintiff had been “rated eligible on suitability.”

 The character Investigation was satisfactory. See footnote 3.

 Plaintiff did not see the job description, or know of Its existence, until some time after he began work.

 No lower grade research and statistical economists were ever assigned for supervision by plaintiif.

 The War Production Board was a fluid agency in 1943 and 1944. While its Office of Manpower Requirements retained its identity during this period, divisions within the Office with similar sesquipedalian titles, were established and dismantled. In the interest of clarity, the names of these various divisions within the Office of Manpower Requirements have been omitted herein as far as possible. Plaintiff’s Employing Officer was at all times head of the division in which plaintiff worked.

 See finding 3.

 See footnote 10.

 The Office of Manpower Requirements was coordinate with the Office of Labor Production. Each Office had at its head a Vice-Chairman of the War Production Board. The Office of Labor Production dealt with labor management relations, including the various human elements that bore upon war production. The Office of Manpower Requirements, on the other hand, searched for occurrence and causes of manpower shortages, as described above. The findings of the Office of Manpower Requirements were made known to the Office of Labor Production, and the two Offices worked together to remove the obstacle to production. Each of the Offices had a staff of labor economists; one staff was coordinate with the other; and both compiled data (although not necessarily the same data) relating to the same industries.
Both Offices had functions which were concerned with adjustments relating to production. Neither was concerned with the finding, movement, and placement of workmen, which was the function of the War Manpower Commission.

 The Report listed 20 elements and directed the rating official to rate only on elements pertinent to the position, to underline the elements especially important to the position, and to mark with a check mark (V) if adequate, a minus sign ( — ) if weak, and a plus mark (+) if outstanding.
The Report contained the following directions for the assignment of adjective ratings :
Plus marks on all underlined elements, and no minus marks_Excellent. Plus marks on at least half of the underlined elements, and no minus marks_Very Good. Check marks or better on a majority of underlined elements, and any minus marks overcompensated by plus marks_Good. Check marks or better on a majority of underlined elements, and minus marks not overcompensated by plus marks_Pair. Minus marks on at least half of the underlined elements_Unsatisfactory.

 Similar releases for transfer or other means of changing employment were standard practice at the time in conformity with the “freeze” orders of the War Manpower Commission.

 Pertinent portions of the Instruction are set forth in finding 46.

 The text of the memorandum is contained in finding 47.

 The text of the memorandum Is contained in finding 48.

 The text of the memorandum is contained in finding 49.

 The text of the memorandum is contained in finding SO.

 The text of the memorandum is contained in finding 51.

 The text of the memorandum, is contained in finding 52.

 The text of the memorandum is contained in finding 53.

 This appeal by plaintiff of his efficiency rating was intended by him (1) to induce completion (by the addition of the signatures of the rating and reviewing officials) of the official Report of Efficiency Rating, (2) to “nail down” an efficiency rating of “Good” in the course of proceedings to remove him for the good of the service, (3) to delay, if possible, his separation until one year from the date of his appointment had expired, and (4) in any event, to forestall his release on the ground that his services had not been satisfactory, by showing an official rating of satisfactory at least during the first 10 months of the trial period.

 CL'he text of the memorandum is contained in finding 54.

 October 30, 1944, was a Monday. Plaintiff’s memorandum to the Chairman had been written (1) on plaintiff’s last day of work and (2) on the same day on which he had conferred with the Director of Personnel. It does not appear from the evidence whether the memorandum was written before or after the conference.

 See finding 19 and footnote 11*

 Cf. footnote 26.

 In 1949, plaintiff reguested and obtained a further hearing, scheduled as a review of the decision of the Efficiency Rating Board of Review. Extensive testimony was taken, but no decision was rendered. Instead, by letter dated August 10, 1949, the Chief, Efficiency Ratings Administration Section, Personnel Classification Division, united States Civil Service Commission, advised plaintiff that 5
Your performance during the period from November 15, 1943. to September 14, 1944, was declared by the Board of Review to be “Good”, which signifies that it was fully satisfactory. This means, in effect, that you demonstrated outstanding performance in such a degree that your work performance was satisfactory in spite of a weakness noted in one of the rating elements. The outstanding factors of your work performance were declared to he more important than any weakness found to exist. The Board of Review had no authority to review or pass upon the charges preferred against you on September 29, 1944, and its decision did not relate to these charges. If any consideration is given to the decision of the Board of Review in connection with these charges, the decision must be recognized as a finding that your efficiency in the performance of assigned work was fully satisfactory for the period from November 15, 1943, to September 14, 1944. The decision could not properly be used as evidence of a weakness in any particular related to the performance of work, without accepting its conclusion that your work, as a whole, was fully satisfactory.

 Plaintiff contends (1) that the Employing Officer’s statement of reasons for requesting plaintiff’s removal for the good of the service, constituted charges; (2) that charges are preferred to bring about a removal for cause: (3) that a discharge for cause implies guilt of misconduct or delinquency in the sense of reprehensible wrongdoing; (4) that he, plaintiff, has not been guilty of any such misconduct or delinquency; and (5) that the officials of the War Production Board selected and devised this method of effecting his removal, intending that such action should virtually preclude his further employment in the Government: Wherefore, their action is in itself evidence of malice. He has rationalized many other facets of the case into supporting evidence.
Plaintiff has never accepted the facts, amply supported by the record: (1) that, in the Judgment of many who have had occasion to deal with him, he does not get along well with other people; (2) that because of this weakness, he failed to satisfy the requirements of the position for which he was hired, in a full and fair on-the-job trial; (3) that his administrative superiors were (a) lenient in transferring him to another assignment and (b) generous in giving him efficiency ratings which preserved for him a satisfactory employment record; (4) that his refusal to resign, after (a) notice that his limited assignment would have to be discontinued and (b) a reasonable opportunity to locate other employment, forced the hand of his administrative superiors ; and (5) that his removal for the good of the service was the method by which his administrative superiors resolved the issue which he had forced.

 Cf. finding 23.

 Cf. finding 25.

 Cf. finding 26.

 Cf. finding 27.

 Cf. finding 28.

 Cf. finding 29.

 Ci. finding 30.

 Cf. finding 33.

 Cf. finding 35.